IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

| | |
|---|---|
| CHARGE LION, LLC,<br><br>         Plaintiff,<br><br>v.<br><br>LINEAR TECHNOLOGY CORPORATION<br><br>         Defendant. | Case No. 6:12-CV-858<br><br>**JURY TRIAL DEMANDED** |

**DEFENDANT LINEAR TECHNOLOGY CORPORATION'S RULE 12(b)(6)
MOTION TO DISMISS PLAINTIFF CHARGE LION'S AMENDED COMPLAINT**

  Defendant Linear Technology Corporation ("Linear") respectfully moves the Court, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, to dismiss Plaintiff Charge Lion, LLC's ("Charge Lion") Amended Complaint (Dkt. 16) in its entirety. That Amended Complaint alleges that fifty-five (55) Linear battery charger integrated circuits ("Accused Products") allegedly infringe United States Patent No. 5,543,702 ("the '702 Patent" or "Asserted Patent," which is attached as Exhibit 1). As discussed below, Charge Lion has failed to state a plausible claim of patent infringement upon which relief can be granted.

**I. INTRODUCTION**

  This is a patent infringement case that should be dismissed at the pleading stage, as there is no plausible interpretation of the patent claims that could possibly support a finding that Linear's Accused Products infringe. The independent claims of the '702 Patent[1] are limited to

---

[1] It is axiomatic that a "conclusion of noninfringement as to the independent claims requires a conclusion of noninfringement as to the dependent claims." *Muniauction, Inc. v. Thompson Corp.*, 532 F.3d 1318, 1329 (Fed. Cir. 2008) (citing *Monsanto Co. v. Syngenta Seeds, Inc.*, 503 F.3d 1352, 1359 (Fed. Cir. 2007).

battery chargers having functional or physical properties that the Accused Products lack, and that Charge Lion knows that they lack.  For example, the '702 Patent claims chargers and methods that are "particularly" for charging alkaline batteries.  Linear's public website (http://www.linear.com/) maintains detailed datasheets for each Accused Products, organized by model number.  These datasheets are attached hereto as Exhibit 2. They establish beyond any doubt that *none* of the Accused Products is for charging alkaline batteries.  Indeed, all Accused Products except LTC Model Nos. 4060 ("LTC 4060") are integrated circuits for devices that charge only *Li-ion batteries (see, e.g.,* Ex. 2 at 1, 13, 25, 37, 49, 77, 101, 125, 145, 181, 217, 253, 281, 313, 337, 353, 369, 393, 409, 441, 461, 481, 497, 513, 531, 559, 579, 595, 611, 627, 643, 659, 675, 691, 711, 731, 755, 779, 803, 827, 851, 875, 891, 907, and 927)[2]; and LTC 4060 is an integrated circuit for devices that charge only *nickel-cadmium and nickel–metal hydride batteries. (See id*. at 421).  For at least these reasons, the Accused Products cannot infringe any claims of the '702 Patent.

The '702 Patent claims also include other limitations that are absent from the Accused Products.  For example, one independent claim (claim 47) requires a movable charging contact that varies current with position. Again, the publicly available data sheets that are attached as Exhibit 2 demonstrate that none of the Accused Products has this characteristic because they all are simply integrated circuits, without hardware.  Another claim (claim 43) is a method for

---

[2] The Accused Products corresponding to LTC  Nos. 1731-4.1, 1731-4.2, 1731-8.2, 1732-8.4, 1732-4.2, 1732-4, 4056-4.2 can be modified to charge Nickel-cadmium (NiCd) and nickel-metal-hydride (NiMH) batteries. But to do so, they require use of an "external termination," because they are configured for charging only Li-ion batteries. (*See* Ex. 2 at 1, 13, 25, 37, and 393).  Moreover, someone who wishes to modify the product must "forc[e] the TIMER pin to $V_{CC}$" or "connect the BAT pin to a voltage between the trickle charge threshold and the final float voltage," which essentially turns the Accused Product into a "programmable current source."  (*Id*. at 9, 21, 34, 46, and 406). Thus, as manufactured and sold by Linear, these products are capable only of being used in devices that charge only Li-ion batteries.

charging batteries of N, AAA, AA, C and D sizes.  But Charge Lion has not alleged that there are Li-ion battery chargers anywhere in the world that can charge batteries of N size, and Linear is not aware of any such devices (or even that N size Li-ion batteries exist).  Thus, for this reason alone, 54 of the 55 Accused Products (all except LTC 4060) *cannot* infringe claim 47.    Claim 43 also requires that a "variable reference voltage" be applied across terminals of the battery, which is increased "when the battery voltage rises to exceed the reference voltage."   But it is public knowledge from the applicable datasheet that the LTC 4060 integrated circuit, which uses a "voltage based termination event ($-\Delta V$)" that detects a drop in the battery voltage—a characteristic of a charged NiCd and NiMH battery (*see* Ex. 2 at 421 and 425) —provides a *constant* current to charge the battery. The only "voltage" that could possibly be argued to be the claimed "reference voltage" is the fail-safe "Maximum Voltage," which does *not* vary. (*See* Ex. 2 at 421 and 429).

As stated above, each Accused Product is described, in detail, in the publicly available datasheets that are collected in Exhibit 2. These datasheets are available on Linear's public website and typically appear as the first-listed item in a Google search of any Accused Product. Accordingly, if Charge Lion performed even the most cursory Rule 11 investigation before filing this case, it has long known that its case against the Accused Product is frivolous.  Because Charge Lion has no plausible theory of infringement, its nonspecific infringement claim against the Accused Products should be dismissed for failure to state a claim upon which relief can be granted.  In the alternative, if the Court is inclined to deny this motion to dismiss for any reason, Linear respectfully requests that the Court stay any general discovery against Linear, to allow early resolution of these threshold non-infringement issues and prompt consideration of a Rule 11 motion.

## II. BACKGROUND

### A. Procedural History

In the Fall of 2012, Charge Lion filed separate complaints in this Court that set forth substantially identical, boilerplate allegations against eight unrelated defendants who purportedly infringed the '702 Patent. Charge Lion sued three defendants on October 12, 2012, and five defendants, including Linear, on November 7, 2012. Charge Lion subsequently abandoned its indirect infringement claims against Linear, Dkt. 17, and amended its Complaint to assert only direct infringement, on February 11, 2013. Dkt. 16. Charge Lion's Amended Complaint offers vague infringement allegations against "Defendant's various battery charger and/or battery charger controller IC products (including, without limitation, at least those with model numbers listed in Exhibit B)." Exhibit B to Charge Lion's Amended Complaint identifies fifty-five of Linear's integrated circuit products.

### B. The Claims of the '702 Patent Are Limited to Chargers that Are Capable of Charging Alkaline Batteries

The claims of the '702 patent make clear that the claimed invention is limited to chargers that must at least be capable of charging alkaline batteries. There are 11 independent claims in the '702 Patent: claims 1, 3, 4, 5, 28, 36, 38, 43, 47, 50 and 53. All but two (claims 43 and 47) specifically recite that the claimed chargers and methods must be "*particularly* but not exclusively" for charging alkaline batteries. This unambiguous language requires that the recited methods and chargers *must* be for charging alkaline batteries, even though the methods and chargers may also be capable of charging the nickel cadmium and zinc batteries that are disclosed in the specification of the '702 Patent. This claim language, which the Applicant included in the original claims submitted during prosecution, operates as a "clear and unequivocal" disavowal of any claim scope that would purport to cover methods or devices that

cannot charge alkaline batteries. *See BASF Asgro B.V. v. Makhteshim Agan of N. Am., Inc.*, No. 2012-1206 at 15 (Fed. Cir. March 20, 2013) (holding that unambiguous claim language supports finding of disclaimer) (attached hereto as Exhibit 5).

Further, the '702 Patent specification consistently and affirmatively makes clear that the invention relates only to devices and methods that can charge alkaline batteries and, optionally, nickel-cadmium and/or zinc-based batteries. For example, the title of the patent is "*Alkaline battery* charging method and battery charger." The first sentence of the '702 Patent Abstract states that the disclosure is of a "battery charger and method . . . for charging *alkaline, Ni-Cad and zinc-based batteries*, particularly sizes N, AAA, AA, C and D." (emphasis added). Even the "Background of the Invention" section of the specification makes clear that the invention is limited to chargers that are "particularly" for charging alkaline batteries:

> The invention disclosed herein relates to charging dry cell batteries, *particularly of the alkaline type* which are considered non-rechargeable by consumers and now are discarded after the first time they run down. (Col. 1, ll. 7-10, emphasis added)

> \* \* \* \*

> Despite the overwhelming superiority of alkaline batteries, and the fact that they are known by those skilled in the battery art to be rechargeable, *as far as the applicant is aware, there is no commercially available alkaline battery charger*; therefore, they all end up in the trash after a single use. Not only do the millions of discarded alkaline batteries form a source of heavy metal environmental pollution, but they needlessly cost consumers millions of dollars a year in replacement batteries. (Col. 1, ll. 45-53, emphasis added)

> \* \* \* \*

> *There is, however, a need for a battery charging method and charger which safely recharges alkaline batteries, and which preferably recharges Ni--Cad and zinc based batteries as well*, and for a battery charger particularly for recharging alkaline batteries which is relatively simple and inexpensive to manufacture. (Col. 2, ll. 11-16, emphasis added).

The "Objects and Summary of the Invention" section further confirms that the claimed invention is limited to alkaline battery chargers. The two "Objects" of the invention are as follows:

> It is an object of the invention disclosed herein to *recharge alkaline batteries*, particularly sizes N, AAA, AA, C and D. (Col. 2, ll. 26-27)

> Another object of the invention is to provide a method and battery charger which accurately and reliably determine when a battery has been recharged, *particularly alkaline batteries*. (Col. 2, ll. 28-31)

Even at its broadest, the disclosure of the '702 Patent in the Summary of the Invention states that the claimed device or method must be able to charge batteries "of alkaline, Ni-Cad or zinc construction":

> *The invention not only provides for recharging batteries of intermixed sizes, but also different types of both primary and secondary cells of alkaline, Ni--Cad or zinc construction.* Thus, a battery charger according to the invention has the capability of charging intermixed size and type batteries. (Col. 4, ll. 10-14, emphasis added)

In fact, even in the most generic disclosure in the Summary of the Invention section, the Applicant summarizes the invention as a method of charging batteries that are "*particularly* but not exclusively an alkaline battery":

> A method according to the invention for charging a battery, *particularly but not exclusively an alkaline battery*, comprises supplying a substantially constant current to the battery and providing a variable reference voltage including providing a first reference voltage which is greater than the voltage of the battery under charge, thereafter increasing the reference voltage up to a predetermined maximum voltage when the battery voltage rises above the reference voltage within a predetermined charging time period, and terminating the supply of current to the battery when the battery voltage does not rise above the reference voltage within the predetermined charging time period or when the reference voltage reaches the predetermined maximum voltage. (Col. 6, ll. 21-34, emphasis added)

The disclosure in the "Description of the Preferred Embodiments" section is also entirely consistent with the limitation of the scope of the invention to chargers that are capable of

6

charging alkaline batteries. *Every* reference to types of batteries in the specification expressly includes alkaline batteries:

> Voltage regulator 104 supplies sufficient current at +5 volts output to charge and test four N, AAA, AA, C or D size 1.5 volt *alkaline or nickel cadmium batteries* (1.25 v) in any combination of sizes in accordance with the invention, and to supply current to power the various circuits in battery charger 10 and light the various LEDs in battery charger 10. Total maximum current draw is in the order of 0.5 amperes. The preferred nominal charging current for each size battery (*either alkaline or nickel cadmium*), the preferred nominal test current, and the series resistance value 118 which produces the nominal currents are given in Table II for a typical transistor 116 (such as MV5774C or 8550) biased as shown in FIG. 6. (Col. 10, ll. 1-13, emphasis added)
>
> The preferred nominal charging current is about 1 ma per gram for N, AAA and AA sizes, about 0.73 ma per gram for C size and about 0.36 to about 0.49 ma per gram for D size. However, the charging current for the different sizes may vary over a range of values and *still effectively charge alkaline and nickel cadmium batteries* in accordance with the invention. . (Col. 10, ll. 31-34, emphasis added)I

Nothing in the specification even remotely supports the idea that the Applicant believed that the invention could encompass other types of batteries, such as Li-ion or Li-ion/copolymer batteries. In fact, the specification does not even mention a battery type other than alkaline, Ni-Cad and Zinc batteries, let alone suggest that the described technology could potentially be used to charge Li-ion or Li-ion/copolymer batteries. This omission is particularly telling, as Lithium-ion batteries have been commercially available since at least 1991, more than a year before the '702 Patent was filed. *See, e.g.*, K. Oates, *Lithium-ion Batteries: Commercialization History and Current Market, Foresight Science & Technology* (February 23, 2012), available at http://batteries.foresightst.com/resources/Li-IonTechSummary.pdf. (attached as Exhibit 6).[3]

---

[3] S*ee also* Press Release, *Sony's New Nexelion Hybrid Lithium Ion Batteries to Have Thirty-Percent More Capacity Than Conventional Offering* (February 15, 2005), available at http://www.sony.net/SonyInfo/News/Press/200502/05-006E/; Nernst New Energy (Suzhou) Co., *About Li-ion Battery History* (October 8, 2011), available at http://www.nernst-energy.com/news.php?id=41.

Although the remaining two independent claims, claims 43 and 47, do not include the express language "*particularly* but not exclusively" for charging alkaline batteries, these claims should nevertheless be construed, commensurate with the specification, to cover only a "method and charger which safely recharges alkaline batteries, and which preferably recharges Ni-Cad and zinc based batteries." (*See, e.g.,* Col. 2, ll. 11-14).  Consequently, every independent claim is limited to battery chargers and methods that must be capable of charging an alkaline battery.

### C. Claims 43 and 47 of the '702 Patent Also Require Features That Are Clearly Absent From the Accused Products

Claim 43 recites, *inter alia*, a "method for charging batteries of N, AAA, AA, C and D sizes."  This limitation is a "clear and unequivocal" disavowal of any claim scope that would purport to cover accused methods that do not charge batteries of these "sizes." *BASF*, No. 2012-1206 at 15.  Claim 43 also affirmatively recites a method by which a "variable reference voltage" is applied across terminals of the battery and increased "when the battery voltage rises to exceed the reference voltage." Claim 43 cannot, therefore, cover a method that does not use such a variable voltage.

Similarly, claim 47 unambiguously recites a "contact element being movably mounted in said battery holding means to accommodate and electrically connect batteries of different sizes, and means mechanically coupling said contact element with said adjustable circuit such that said charging current supplying means supplies charging currents of values dependent upon the position of said contact element."  Further, the prosecution history of the '702 Patent clearly evidences that the Applicant disclaimed chargers without the claimed "contact means."  In response to a prior art rejection, the Applicant argued that pending claim 52, which became issued claim 47, describes:

> a battery charger which includes an adjustable circuit having a movable contact which moves to accommodate batteries of different sizes, and in doing so, adjusts

8

>the adjustable circuit. As mentioned above, the movable resistance elements of *Fister* are not the claimed movable contacts, and contacts 23-28 in *Fister* are not movable to accommodate batteries of different sizes and do not adjust anything even if they moved.

Exhibit 3 attached hereto (Applicant's October, 4, 1994 response to the Examiner) at 1.

>The Applicant made a similar argument in its subsequent Patent Office filing:

>Claims 52 and 55 claim battery chargers which include, among other things, an adjustable circuit which controls the magnitude of charging current, a contact element movably mounted in a battery holding means to accommodate and electrically connect batteries of different sizes, and means mechanically coupling the contact element with the adjustable circuit such that the adjustable circuit supplies charging currents of values dependent upon the position of the contact element.

>As discussed above, in *Floyd,* the position of the movable boxlike members 24a and 24b which each carry a contact for a different battery have no effect on the current supplied to a respective battery. Therefore, it is submitted that independent claim 52, and with it dependent claims 53 and 54, and independent claim 55, and with it dependent claims 56 and 57, are allowable over *Floyd.* Note that the battery charger claimed in claim 55 also includes means for supplying substantially constant current.

Exhibit 4 (Applicant's April 23, 1995 response to the Examiner) at 12-13. In response to the Applicant's arguments and representations, the Examiner allowed the claims. Thus, the prosecution history demonstrates that the Applicant clearly and unequivocally disclaimed devices lacking a "contact element with the adjustable circuit such that the adjustable circuit supplies charging currents of values dependent upon the position of the contact element." *BASF*, 2012-1206 at 13 (citing *Ekchian v. Home Depot, Inc.*, 104 F.3d 1299, 1304 (Fed. Cir. 1997)

To prevail on a patent infringement claim, the accused product must include *all* limitations of one or more claims. *See, e.g., Cross Med. Prods., Inc. v. Medtronic Sofamor Danek, Inc.*, 424 F. 3d 1293, 1310 (Fed. Cir. 2005). None of the Accused Products meets all the

limitations of any claim. Although this motion focuses on only a handful of missing limitations, there are many other missing limitations that are outside the scope of this motion.

### D. The Accused Products

The Accused Products comprise fifty-five separate integrated circuits that may be used in devices that charge batteries. Fifty-four of the fifty-five Accused Products listed in Exhibit B to Charge Lion's Amended Complaint can only be used in devices that charge *only* Lithium-Ion or Lithium-Ion/Polymer batteries. *(See, e.g.*, Ex. 2 at 1, 13, 25, 37, 49, 77, 101, 125, 145, 181, 217, 253, 281, 313, 337, 353, 369, 393, 409, 441, 461, 481, 497, 513, 531, 559, 579, 595, 611, 627, 643, 659, 675, 691, 711, 731, 755, 779, 803, 827, 851, 875, 891, 907, and 927).[4] The other product, model LTC 4060, is for charging *only* NiMH/NiCd batteries. *(See id*. at 421). Critically, none of the Accused products is even *capable* of charging alkaline batteries, much less *"particularly"* for charging such batteries.

Moreover, as noted above, Charge Lion has not alleged that *any* battery chargers even exist that charge Li-ion or Li-ion/copolymer batteries of N size (or even that Li-ion or Li-ion/copolymer batteries of N size exist), and Linear is not aware of any such chargers or batteries. Consequently, the fifty-four of the fifty-five Accused Products that can be used with chargers of Li-ion batteries cannot possibly meet the claim limitation requiring that they be capable of charging batteries of "N, AAA, AA, C and D sizes." And LTC 4060, the only Accused Product that can be used in a device that charges batteries other than Li-ion or Li-ion/copolymer, does not provide a variable "reference voltage" during charging. (S*ee* Ex. 2 at 421 and 429). In addition, the Accused Products are each integrated circuits and therefore do not

---

[4] As noted above, LTC Nos. 1731-4.1, 1731-4.2, 1731-8.2, 1732-8.4, 1732-4.2, 1732-4, 4056-4.2 can be modified, with an "external termination," to charge Nickel-cadmium (NiCd) and nickel-metal-hydride (NiMH) batteries. But as manufactured and sold by Linear, these products are capable only of being used in devices that charge Li-ion batteries.

have a "movable contact," let alone a charging current that is "dependent upon the position of said contact element."

## III. ARGUMENT

### A. Legal Standard

#### 1. A Claim of Infringement Must Be Specific and Plausible

Federal Rule of Civil Procedure 12(b)(6) mandates dismissal if there is a "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). The Federal Rules of Civil Procedure require that a pleading contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). A complaint need not necessarily contain "detailed factual allegations," but it must contain more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). "Factual allegations must be enough to raise a right to relief above the speculative level," *Twombly*, 550 U.S. at 545, and must create "a reasonable expectation that discovery will reveal evidence of illegal [conduct]." *Id.* at 556. "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Iqbal*, 556 U.S. at 678.

In deciding a motion to dismiss, a court must accept the factual allegations in the complaint as true. *Id.* A court must not, however, accept legal conclusions as true. *Id.* "Threadbare recitals of the elements of a cause of action, supported by mere conclusory

11

statements, do not suffice." *Id.* (citing *Twombly*, 550 U.S. at 555). Without requiring at least facial plausibility, "claim[s] would survive a motion to dismiss whenever the pleadings left open the possibility that a plaintiff might later establish some 'set of [undisclosed] facts' to support" the claim. *Id.* at 561. Courts should act as a gatekeeper and require specificity and plausibility "before allowing a potentially massive factual controversy to proceed." *Id.* at 558 (quoting *Assoc. Gen. Contractors of Cal., Inc., v. Cal. State Council of Carpenters*, 459 U.S. 519, 528 n.17 (1983)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556). Determining plausibility is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679; *see also L-7 Designs, Inc. v. Old Navy, LLC*, 09 Civ. 1432, 2010 WL 157494 (S.D.N.Y. Jan. 19, 2010) (amended on Jan. 21, 2010) (dismissing breach of contract claim for failure to negotiate in good faith as implausible in view of 33 exhibits showing extensive negotiations).

    **2. A Court May Consider Extrinsic Evidence in Deciding a Motion to Dismiss Under Rule 12(b)(6), Without Converting it to a Motion for Summary Judgment**

"Where plaintiff has actual notice of all the information in the movant's papers and has relied upon these documents in framing the complaint the necessity of translating a Rule 12(b)(6) motion into one under Rule 56 is largely dissipated." *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991). Thus, courts may consider extrinsic evidence of the nature of accused products in granting motions to dismiss patent infringement claims for failure to state a claim. *See, e.g., Catapano v. Wyeth Ayerst Pharms., Inc.*, 88 F. Supp. 2d 27, 29 (E.D.N.Y. 2000) (granting motion to dismiss for failure to state a patent infringement claim based in part upon consideration of description of accused product submitted in connection with moving papers);

*Colida v. Nokia Inc.*, No. 07 Civ. 8056, 2008 WL 4517188, at *3 (S.D.N.Y. May 6, 2008) (considering exhibits disclosing the design of the accused product as "clearly 'integral' to plaintiff's Amended Complaint" in granting motion to dismiss design patent infringement claims), *aff'd*, 347 F. App'x 568 (Fed. Cir. 2009) (unpub.), citing *Global Network Commc'ns, Inc. v. City of N.Y.*, 458 F.3d 150, 156-57 (2d Cir. 2006); *Moody v. Morris*, 608 F. Supp. 2d 575, 579 (S.D.N.Y. 2009) (dismissing patent infringement claim for lack of plausible infringement theory based on exemplar evidence).

Here, Linear asks the Court to credit Charge Lion with actual notice of two pieces of evidence that Charge Lion's counsel necessarily evaluated in bringing this case: Linear's publicly available datasheets regarding the Accused Products, Exhibit 2; and two of the Applicant's filings at the Patent Office in conjunction with the '702 Patent, Exhibits 3 and 4.

**B. Charge Lion's Complaint Should Be Dismissed Because It Fails to Set Forth a Plausible Theory of Infringement.**

Charge Lion's Amended Complaint cursorily recites, "[u]pon information and belief," that 55 of Linear integrated circuits infringe the '702 Patent. (Dkt. #16 at ¶ 7). "Information and belief" is not, however, good enough where the publicly available data sheets have detailed information about the Accused Products that makes clear that all the Accused Products lack key claim limitations. Indeed, Charge Lion's bare bones Amended Complaint asserts nothing that is inconsistent with the data sheets. Charge Lion's nonspecific and conclusory allegation that 55 products infringe one or more claims of the '702 Patent falls well short of the *Iqbal* and *Twombly* standard, and fails to state a claim upon which relief may be granted. *See Cal. Inst. of Computer Assisted Surgery, Inc. v. Med- Surgical Servs., Inc.*, No. 10-cv-02042, 2010 WL 3063132, at *2 (N.D. Cal. Aug. 3, 2010) (granting motion to dismiss infringement allegations because the plaintiff "fails to allege with any specificity what [the allegedly infringing product] is and how it

infringes upon any of its four patents"); *see also Bender v. LG Elecs.*, No. C 09-02114 JF (PVT), 2010 WL 889541, at *6 (N.D. Cal. Mar. 11, 2010) (requiring sufficient infringement allegations to provide at least "a brief description of what the patent at issue does" and "an allegation that certain named and specifically identified products or product components also do what the patent does").

As described above, under any conceivable construction, each claim of the '702 Patent requires that the claimed charger or method of charging be capable of charging alkaline batteries. In contrast, none of the Accused Products is capable of being used in a charger to charge alkaline batteries, much less is it "particularly" for charging alkaline batteries. Thus, Charge Lion has no basis to allege infringement of the '702 Patent by the Accused Products. Moreover, fifty-four of the fifty five Accused Products are integrated circuits that can be used in chargers for only Li-ion and Li-ion/copolymer batteries, which are not contemplated in the specification. Accordingly, Charge Lion's claim should be dismissed with respect to the 54 of the 55 Accused Products that may *only* be used in devices for charging Li-ion and Li-ion/copolymer batteries.

In fact, the only two claims in the '702 Patent that even arguably are not limited to alkaline batteries impose other requirements that are clearly absent from the Accused Products. For example, claim 43 requires charging batteries of N, AAA, AA, C and D sizes, but there is no allegation or evidence that Li-ion and Li-ion/copolymer batteries—let alone battery chargers for those batteries—are even available in N size. And claim 47 requires a "movable contact" such that the charging currents are "dependent upon the position of said contact element." But such movable contacts cannot possibly be included in the Accused Products, which are *integrated circuits*.

In short, because Charge Lion has no plausible theory to support its bald accusation of infringement, its Amended Complaint must be dismissed: "[t]he minimum corpus of factual allegations sufficient to establish a plausible claim would necessarily include the identity of the specific infringing products *and some articulated reason to suspect that the products were made in violation of the patents-in- suit.*" *Prestige Pet Prods., Inc. v. Pingyang Huaxing Leather & Plastic Co. Ltd.*, 767 F.Supp.2d 806, 812 (E.D. Mich. 2011) (emphasis added).

A patentholder's failure to offer a plausible theory of infringement is fatal in the face of a Rule 12(b)(6) motion to dismiss. For example, in *Prestige Pet*, the patentholder asserted patent claims directed to a method of flavoring pet chew toys against various pet chew product lines. The court dismissed, noting that "[l]acking any factual basis or elaboration, Plaintiff's claims, that appear to embrace all dog chew products and allege that all such toys are made using the method of the [asserted patent], are no more plausible than would be a claim that the [asserted patent] is infringed by the manufacture of tennis balls or bedroom slippers." *Id.* at 810. Other courts have dismissed similarly implausible patent infringement claims. For example, in *Moody v. Morris*, the trial court dismissed patent infringement claims based on patents directed to a captioning system when the accused television show was comprised of "word-objects" that did not rely on any captioning or subtitling system. 608 F. Supp. 2d 575, 579 (S.D.N.Y. 2009) ("This fundamental difference between [the accused show] and the patents here in issue requires dismissal of the first claim (for patent infringement) of plaintiff's Amended Complaint").

Similarly, the Federal Circuit affirmed the dismissal of a complaint on grounds that it was implausible in view of the clear distinctions between the scope of the asserted design patents and the accused products. *Colida v. Nokia Inc.*, 347 F. App'x 568, 570 (Fed. Cir. 2009) (unpublished); *Colida*, 2008 WL 4517188, at **3, 12 (affirmed magistrate report recommending

15

dismissal of infringement claim: "Defendant argues that its 6061 telephone is so different in design from those claimed in the [asserted] Patents that plaintiff cannot plausibly allege that the 6061 telephone infringes ... Defendant's argument is persuasive" . . . "it is 'patently clear' that plaintiff's claims had 'absolutely no chance of success under the existing precedents'"), quoting *Eastway Const. Corp. v. City of N.Y.*, 762 F.2d 243, 254 (2d Cir. 1985); *see also Cal. Inst.*, 2010 WL 3063132, at *2 (granting motion to dismiss infringement allegations because the plaintiff "fails to allege with any specificity what [the allegedly infringing product] is and how it infringes upon any of its four patents").

Because Charge Lion has failed to articulate a plausible infringement theory (and cannot possibly articulate such a theory in light of Linear's publicly available datasheets), Charge Lion's Amended Complaint should be dismissed.

**C. In the Alternative, Discovery Should Be Stayed Pending Resolution of the Threshold Non-Infringement Issues Raised In this Motion.**

If the Court is inclined to deny this motion to dismiss for any reason, Linear respectfully requests that the Court stay general discovery against Linear to allow early resolution of the threshold non-infringement issues discussed in this brief. This short stay of discovery would not upset the overall schedule or trial date for this case, and would have the salutary benefit of saving Charge Lion, Linear and the Court from the burden and expense of frivolous litigation.

As part of its inherent power to administer its own docket, this Court has broad discretion to stay discovery when the interests of justice so require. *See Little v. City of Seattle*, 863 F.2d 681, 685 (9th Cir. 1988) (affirming stay of discovery to resolve dispositive threshold issue). A stay would be appropriate here where Charge Lion has no basis for its Complaint. Indeed, the "purpose of F. R. Civ. P. 12(b)(6) is to enable defendants to challenge the legal sufficiency of complaints without subjecting themselves to discovery." *Rutman Wine Co. v. E. & J. Gallo*

*Winery*, 829 F.2d 729, 738 (9th Cir. Cal. 1987). As observed in *Rutman Wine Co.*, "'if the allegations of the complaint fail to establish the requisite elements of the cause of action, our requiring costly and time consuming discovery and trial work would represent an abdication of our judicial responsibility.' It is sounder practice to determine whether there is any reasonable likelihood that plaintiffs can construct a claim before forcing the parties to undergo the expense of discovery." *Id.*, quoting *Havoco of America, Ltd. v. Shell Oil Co.*, 626 F.2d 549, 553 (7th Cir. 1980).

Such an approach was recently adopted by Judge Davis in this court. *Parallel Networks LLC v. AEO, Inc.*, 6:10-cv-275, (E.D. Tex. Mar. 15, 2011) (*See* Order attached as Ex. 7). In that case, a non-practicing entity similar to Charge Lion sued multiple defendants. Judge Davis was concerned that the defendants would be presented "with a *Hobson's* choice: spend more than the settlement range on discovery, or settle for what amounts to cost of defense, regardless of whether a Defendant believes it has a legitimate defense." *Id*. at 6. Judge Davis stayed general discovery to resolve a dispositive threshold issue, in order to conserve the resources of the parties and to protect defendants from the pressure to settle a meritless case at nuisance cost to avoid the expense of full discovery.

Requiring Charge Lion to prove that it has a plausible infringement case against Linear at this early stage is not an undue burden. Rather, Charge Lion should already have developed such evidence, if any existed. Indeed, the Federal Circuit has long emphasized the importance of such an early analysis in preventing costly frivolous suits. In affirming an award of sanctions under Rule 11 for a patentholder's failure to conduct a proper pre-filing infringement analysis, the court stated: "[a] patent suit can be an expensive proposition. Defending against baseless claims of infringement subjects the alleged infringer to undue costs— precisely the scenario that Rule


11 contemplates. Performing a pre-filing assessment of the basis of each infringement claim is, therefore, extremely important. In bringing a claim of infringement, *the patent holder, if challenged, must be prepared to demonstrate to both the court and the alleged infringer exactly why it believed before filing the claim that it had a reasonable chance of proving infringement.* *View Eng'g, Inc. v. Robotic Vision Sys., Inc.*, 208 F.3d 981,986 (Fed. Cir. 2000) (emphasis added).

Because the publicly available data sheets provided Charge Lion with incontrovertible proof of *non-infringement* at the time that it filed this lawsuit, this is a compelling case for enforcing this requirement.

## IV. CONCLUSION

Linear should not be required to expend any further time, effort or expense in defending against Charge Lion's frivolous assertion of infringement. For the above reasons, Linear respectfully requests that the Court dismiss the Amended Complaint.

April 4, 2013                                   Respectfully submitted,

                                                */s/ Gregory P. Love*
                                                Gregory P. Love
                                                Texas Bar No. 24013060
OF COUNSEL:                                     Darrell Dotson
                                                Texas Bar No. 24002010
D. Michael Underhill                            STEVENS LOVE
Richard S. Meyer                                P. O. Box 3427
Patrick M. Lafferty                             Longview, Texas 75606-3427
BOIES SCHILLER & FLEXNER LLP                    903.753.6760
5301 Wisconsin Ave, NW, Suite 800               903.753.6761 (Fax)
Washington, DC 20015                            greg@stevenslove.com
202-237-2727                                    darrell@stevenslove.com
202-237-6131 (fax)
munderhill@bsfllp.com
rmeyer@bsfllp.com
plafferty@bsfllp.com

ATTORNEYS FOR DEFENDANT

**CERTIFICATE OF SERVICE**

      The undersigned certifies that the foregoing document was filed electronically in compliance with Local Rule CV-5(a). As such, this document was served on all counsel who are deemed to have consented to electronic service. Local Rule CV-5(a)(3)(A). Pursuant to Fed. R. Civ. P. 5(d) and Local Rule CV-5(d) and (e), all other counsel of record not deemed to have consented to electronic service were served with a true and correct copy of the foregoing by email and/or fax, on this the 4th day of April, 2013.

                                          */s/ Gregory P. Love*
                                          Gregory P. love